UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| LIBERTY MUTUAL FIRE INSURANCE COMPANY; LM GENERAL INSURANCE COMPANY; LM INSURANCE CORPORATION; and SAFECO INSURANCE COMPANY OF ILLINOIS,<br><br>Plaintiffs,<br><br>v.<br><br>NEXTGEN PAIN ASSOCIATES AND REHABILITATION LLC; ABDUL BAYDOUN; and NURA KUTOB,<br><br>Defendants. | C.A. No. _____<br><br><br><br>**Demand for Jury Trial** |

## COMPLAINT

Plaintiffs Liberty Mutual Fire Insurance Company, LM General Insurance Company, LM Insurance Corporation, and Safeco Insurance Company of Illinois (hereinafter, "Liberty Mutual" and/or "plaintiffs"), by their attorneys SMITH & BRINK, hereby allege as follows.

## I.   INTRODUCTION

1.     This is a case about a medical clinic and the owners, agents, and representatives of the same who engaged in a scheme to defraud Liberty Mutual by submitting false and fraudulent records, bills, and invoices through the U.S. Mail seeking to collect payment from Liberty Mutual for treatment and services that were

not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered pursuant to Liberty Mutual policies and applicable provisions of the Michigan No-Fault Act.  In the words of a patient of several of the defendants, they ran a "scam."

2.      The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Liberty Mutual to and on behalf of the defendants pursuant to Liberty Mutual policies and applicable provisions of the Michigan No-Fault Act.

3.      All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

4.      By this Complaint, and as detailed in each count set out below, Liberty Mutual brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.  Liberty Mutual also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

5.      The defendants have submitted charges to Liberty Mutual totaling more than $479,198 through their fraudulent scheme, and Liberty Mutual has paid in excess of $24,873 to them related to the patients at issue in this Complaint.

2

## II.   THE PARTIES

### A.   PLAINTIFFS

6.     Liberty Mutual Fire Insurance Company is a company duly organized and existing under the laws of the State of Wisconsin.

7.     LM General Insurance Company, LM Insurance Corporation, and Safeco Insurance Company of Illinois are companies duly organized under the laws of the State of Illinois.

8.     Liberty Mutual Fire Insurance Company, LM General Insurance Company, LM Insurance Corporation, and Safeco Insurance Company of Illinois have their respective principal places of business in Boston, Massachusetts.

9.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.   DEFENDANTS

#### 1.     NextGen Pain Associates and Rehabilitation, LLC

10.    Defendant NextGen Pain Associates and Rehabilitation, LLC ("NextGen") is a limited liability company organized under the laws of the State of Michigan.

11.    NextGen is owned by layperson Abdul Baydoun ("Baydoun").

12.    At all relevant times, NextGen was owned and controlled by Baydoun and Nura Kutob ("Kutob").

13.    NextGen's principal place of business is located in Dearborn, Michigan.

14.    NextGen billed Liberty Mutual for treatment that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), and was unlawful in relation to several Liberty Mutual insureds, including the patients set out in Exhibit 1.

### 2.    **Abdul Baydoun**

15.    Defendant Baydoun is a resident and citizen of the State of Michigan.

16.    At all times relevant to this Complaint, Baydoun owned NextGen.

17.    At all times relevant to this Complaint, Baydoun controlled NextGen, including holding himself out as NextGen's Chief Executive Officer.

18.    Baydoun made decisions on behalf of NextGen, including prescriptions to be issued to patients, treatment to coerce patients to undergo, and hiring and managing physicians at NextGen, even though Baydoun is a layperson and not a healthcare professional.

19.    Baydoun also entered into contracts on behalf of NextGen and made decisions about which claims to submit to Liberty Mutual and which claims to litigate.

### 3.    **Nura Kutob**

20.    Defendant Kutob is a resident and citizen of the State of Michigan.

21.     At all times relevant to this Complaint, Kutob controlled NextGen.

22.     Kutob (a layperson and not a healthcare professional) controlled NextGen's day-to-day operations, as confirmed by her husband Baydoun.

23.     Kutob also directed which patients physicians at NextGen saw each day and influenced the treatment allegedly rendered by and at NextGen, even though she is a layperson.

## III.    **JURISDICTION AND VENUE**

24.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by the plaintiffs under 18 U.S.C. § 1961 *et seq*. because they arise under the laws of the United States.

25.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

26.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

27.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.   BILLING FOR SERVICES NOT RENDERED

28.    The defendants submitted bills to Liberty Mutual seeking payment for treatment and services that were never rendered to patients at issue herein.

29.    For example, Patient D.T. (Claim No. 942135536002)[1] was purportedly issued pulsed electromagnetic field therapy ("PEMF") devices by NextGen for her lumbar spine on August 17, 2017 and her cervical spine on September 14, 2017.

30.    NextGen billed Liberty Mutual $17,750 for each device, for a total of $35,500.

31.    D.T. was just fourteen (14) years old at the time, and use of these PEMF devices was expressly contraindicated by instructions provided to NextGen by the manufacturer.

32.    Each of the devices purportedly issued to D.T. was allegedly ordered by podiatrist Bruce Kallou, D.P.M. ("Kallou"), who had no training or authority to provide any treatment to D.T.'s spine.

33.    D.T. was shown a photograph of Kallou during a deposition and testified that she had never seen him before.

34.    Liberty Mutual also obtained documentation of all sales of PEMF devices to NextGen from the manufacturer of the devices, and the first cervical spine device was not sold to NextGen until September 29, 2017.

---

[1] To protect the confidentiality of its insureds, Liberty Mutual refers to them herein by initials and claim number.

6

35.     In other words, NextGen could not have actually provided D.T. with the second PEMF device for which it billed Liberty Mutual $17,750, because it did not actually have the device it claims to have issued.

36.     The president of the PEMF device manufacturer confirmed in sworn testimony that NextGen was never sold a cervical device prior to September 29, 2017.

37.     NextGen also submitted bills to Liberty Mutual relative to patient A.B. (Claim No. 363898040001) totaling $35,500 claiming to have issue the same type of PEMF device.

38.     A.B. testified that she never received any medical equipment from NextGen.

39.     NextGen also billed Liberty Mutual for services it never performed.

40.     For example, NextGen billed Liberty Mutual for an examination allegedly performed by podiatrist Kallou of patient S.J. (Claim No. 035723234) on August 17, 2017

41.     Kallou testified that he did not examine S.J. on August 17, 2017, and had not even started working for NextGen as of that date.

42.      NextGen also billed Liberty Mutual for a urine drug test purportedly ordered by Kallou on August 17, 2017, which could not have actually been

performed as Kallou confirmed that he was not even associated with NextGen at the time.

43.     The defendants submitted fraudulent claims to Liberty Mutual relative to each of the above-referenced exemplar patients, along with the other patients identified in Exhibit 1, and Liberty Mutual relied on such submissions in adjusting the claims.

44.     Liberty Mutual is not required to reimburse the defendants for services that were not actually rendered and is entitled to repayment for payments it was induced by make by the defendants' fraudulent submissions.

## V.     IMPROPER KICKBACKS AND INDUCEMENTS

45.     In order to maximize the number of patients who presented to NextGen for treatment, and the number of tests, treatments, and services ordered for such patients and billed to Liberty Mutual, the defendants paid and knowingly benefitted from improper kickbacks and inducements.

46.     The defendants relied on *quid pro quo* referral arrangements to obtain patients for NextGen.

47.     Several of the primary sources of referrals of patients to NextGen were physical therapy clinics with which it maintained such agreements.

48.     Physical therapy clinics need providers like NextGen to write prescriptions for physical therapy, as Michigan law requires that physical therapy

treatment be prescribed by a licensed medical or osteopathic doctor if such treatment exceeds twenty-one (21) days or ten (10) visits.  Mich. Comp. Laws. § 333.17820(1).

49.  As discussed further below, NextGen indiscriminately wrote prescriptions for physical therapy in exchange for patient referrals.

50.  The physical therapy clinics who referred patients to NextGen used brazenly illegal and improper inducements to obtain and control patients.

51.  One clinic, who told patient A.B. (Claim No. 363898040001) that NextGen "is the only place they trust," routinely offered patients cash payments in exchange for undergoing treatment.

52.  Patient A.B. (Claim No. 363898040001) testified that she was paid as much as $100 per visit for undergoing treatment at this physical therapy clinic, which was directly responsible for her referral to NextGen.

53.  The compensation paid by the physical therapy clinic was expressly made to compensate A.B. for presenting for treatment: "I did get compensation for coming because I was in school so I had to take time out of being in school to come to the therapy place."

54.  A.B. also witnessed other patients being paid in cash by the physical therapy clinic in exchange for treating every time she was at the clinic.

55.  Upon information and belief, NextGen also utilized similar cash payments to induce treatments.

56.    Bank records obtained by Liberty Mutual from just one of NextGen's operating accounts evidence cash withdrawals totaling at least $115,175 over the course of approximately eleven (11) months from June 5, 2017 to May 17, 2018.

57.    This total amount was withdrawn in 199 separate transactions, 154 of which were for exactly $600.

58.    Many of these $600 withdrawals were made in close temporal proximity to one another, with as many as four (4) such withdrawals being made on the same date.

59.    NextGen, a medical clinic, did not have any valid expenses that required this amount of cash, and the bank records separately account payments made by NextGen for other costs, including physicians, staff, and supplies.

60.    Liberty Mutual has also obtained bank records from accounts owned by Baydoun and Kutob personally, and by other entities they own and control, all of which were used for very similar patterns and amounts of cash withdrawals.

61.    The defendants also paid kickbacks to NextGen's physicians to induce orders for treatment and testing that was medically unnecessary.

62.    For example, podiatrist Kallou testified that his contract with NextGen included terms whereby his compensation would increase if he referred patients for MRIs.

63.     Treatment and testing that requires financial or other inducement to order or undergo is medically unnecessary, and all bills mailed to Liberty Mutual by the defendants for such treatment and testing were fraudulent.

## VI.    **BILLING FOR UNLAWFUL TREATMENT**

64.     The defendants violated several Michigan laws and regulations in their effort to bill Liberty Mutual for as much treatment as possible.

65.     NextGen routinely billed Liberty Mutual for purportedly issuing durable medical equipment (DME) to patients at issue herein.

66.     In order to legally issue DME in Michigan, a provider must obtain a license from the Michigan Board of Pharmacy.

67.     NextGen has never possessed a valid license to issue DME in the State of Michigan.

68.     NextGen also billed Liberty Mutual for tens of thousands of dollars of services purportedly ordered and performed by podiatrist Kallou.

69.     Podiatrists in Michigan are only authorized to provide treatment to the foot, ankle, and nails.  *See* Mich. Comp. Laws § 333.18001(1)(i).

70.     Purported services by Kallou billed by NextGen were to patients' spines and extremities, and were never limited to the body parts podiatrists are authorized by Michigan law to evaluate and treat.

71.     Kallou testified regarding defendant Baydoun's efforts to have him order services beyond his lawful authority:

> [Baydoun] was like, "Hey, can you just sign this?  We forgot to have the physician sign this script for a back brace."  I'm like, "No, it's not – I don't know who this is.  I don't know what this is."  And then he's like, "Oh, just go ahead."

72.     As discussed below, when Baydoun, Kutob, and NextGen were unable to compel Kallou to sign such prescriptions, they forged his signature.

## VII.   FORGED AND FALSIFIED RECORDS

73.     In order to conceal their fraud and induce Liberty Mutual to make benefit payments to which they were not entitled, the defendants routinely altered, forged, and falsified records submitted to support their bills.

74.     NextGen submitted numerous records to Liberty Mutual representing that Kallou, who is a podiatrist, is actually a medical doctor in an attempt to induce payment for treatments performed to and ordered for patients' spines and extremities, which Kallou was not qualified to evaluate or treat.  *See* Exhibits 2 and 3.

75.     Podiatrist Kallou also testified that he discovered that NextGen was "writing prescriptions behind [his] back" under his name and "saying that [he was] physician of record for things that [he did not] know about."

76.     Kallou further testified that all prescriptions he wrote while at NextGen were handwritten on prescription pads with NextGen letterhead across the top.

77.    Kallou testified that he has seen several examples of prescriptions bearing his name on different forms that he never used while at NextGen.

78.    Kallou specifically identified records that were submitted by NextGen to Liberty Mutual relative to patient S.J. (Claim No. 035723234) as forgeries that he did not actually sign, including electronically-written prescriptions dated October 17, 2017 and November 16, 2017, both of which were after he stopped working at NextGen. *See* Exhibits 4 and 5.

79.    NextGen's records were easily altered and fabricated by the defendants, because the majority of the records submitted to Liberty Mutual were unsigned by the physician who purportedly performed the treatment.

80.    NextGen created medical records using software called Practice Fusion, which does not lock a medical record from revision until it is signed by the physician.

81.    The records submitted to Liberty Mutual by NextGen were rarely, if ever, signed by the physician who allegedly performed the evaluation or treatment documented thereon, meaning the records could be altered by anyone.

82.    Records submitted by NextGen disclose that Baydoun had access to these unsigned records, and several, like the example pictured below created relative to patient M.S. (Claim No. 775160756002), represented that Baydoun had performed the evaluation and treatment:

FACILITY
**NextGen Pain Associates and Rehab**
T  (313) 528-0181
F  (313) 528-0182
13530 Michigan Ave
Suite 310
Dearborn, MI 48126

ENCOUNTER
**Office Visit**
NOTE TYPE          SOAP Note
SEEN BY            abdul Baydoun
DATE               12/21/2018
AGE AT DOS         42 yrs
Not signed

83.     The defendants' willingness to alter records submitted to Liberty Mutual is also illustrated by testimony given by patient A.B. (Claim No. 363898040001), for whom NextGen billed Liberty Mutual for purportedly performing a comprehensive evaluation on November 7, 2017, specifically representing that a physical examination was performed.

84.     A.B. testified that her interaction with the NextGen physician was limited to a conversation, that no examination was performed, and that she did not get out of her chair during the interaction.

85.     Liberty Mutual relied on the bills and records submitted by the defendants to accurately and truthfully document the treatment performed.

86.     The false and fabricated bills and records mailed to Liberty Mutual by the defendants induced Liberty Mutual to pay benefits to which the defendants were not entitled, and Liberty Mutual is entitled to repayment for payments it was induced by make by the defendants' fraudulent submissions.

## VIII.  <u>UNLAWFUL SOLICITATION</u>

87.     The defendants' fraudulent scheme required constant identification of and access to new alleged auto accident victims in order to generate bills for the medically unnecessary and excessive treatment that was billed to Liberty Mutual.

88.     It is unlawful in Michigan to contact any person injured in a motor vehicle accident within 30 days of the accident with a direct solicitation to provide a service.  Mich. Comp. Laws § 750.410b.

89.     Unlawful solicitation leads to unnecessary, and therefore non-compensable, medical treatment, as patients who are in need of medical care do not require inducement to seek it.

90.     One of the sources of referrals relied upon by the defendants was physical therapy clinics with which they maintained *quid pro quo* referral relationships.

91.     The defendants were aware that these physical therapy clinics used numerous tactics to identify, recruit, and solicit patients that violated Michigan law.

92.     For example, patient A.B. (Claim No. 363898040001) testified that she was approached at the scene of her motor vehicle accident by a "recruiter" from her physical therapy clinic named June who directed her to the clinic for treatment.

93.     June, who was not a medical provider, stayed in contact with A.B. throughout her course of treatment and when A.B. told June that she was stopping treatment because it was not helping, he attempted to convince her to continue.

94.     June also attempted to contact A.B. prior to her deposition testimony, which A.B. believes was to implore her not to disclose his involvement.

95.     The defendants' billing resulting from unlawfully solicited patients is unlawful, unreasonable, and unnecessary, and therefore is not reimbursable under any Liberty Mutual insurance policy or applicable provisions of the Michigan No-Fault Act.

## IX.    UNREASONABLE      AND      UNNECESSARY      FRAUDULENT TREATMENT

96.     The defendants' goal in treating patients was to perform as much treatment as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, or rehabilitation, in order to generate bills to be submitted to Liberty Mutual.

97.     The defendants also sought to bolster the appearance of injury and, therefore, increase the amount of treatment for which insurers such as Liberty Mutual were billed.

98.     To maximize financial benefit, the defendants adhered to a predetermined protocol of treatment causing their patients to undergo unnecessary, indiscriminate, and excessive treatment, as discussed more fully below.

16

99.     The defendants' treatment violated established standards of care in the medical community, as the vast majority of testing, diagnostics, referrals, and treatment were not indicated, redundant, excessive, and repeated without any objectively documented benefit to patients.

100.    The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they allegedly provided was not known to Liberty Mutual until it undertook the full investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

101.    The unnecessary treatment rendered by the defendants, discussed more fully below, includes, but is not limited to, the treatment and patients set out in the chart annexed hereto at Exhibit 1.

102.    All of the claims submitted by the defendants to Liberty Mutual through the U.S. Mail seeking reimbursement for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

103.    None of the fraudulent claims submitted by the defendants are compensable under a Liberty Mutual insurance policy or applicable provisions of the Michigan No-Fault Act.

104.    Liberty Mutual is not required to compensate the defendants for treatment that was rendered based on a predetermined treatment protocol that was

not patient-specific, and therefore medically unnecessary, and it is entitled to the return of money paid in reliance on the defendants' fraud.

105.   None of the above facts were known to Liberty Mutual until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Liberty Mutual by the defendants.

### A.   MEDICALLY UNNECESSARY PAIN MANAGEMENT TREATMENT

106.   The defendants used NextGen both to generate its own claims for unnecessary medical treatment and to order and prescribe unnecessary treatment, testing, services, and DME for which their associates submitted claims to Liberty Mutual.

107.   The defendants grossly overutilized physical therapy, disability certificates, medications, DME, injection procedures, urine drug testing, and surgeries in clear disregard for standards of care.

108.   In order to prescribe and perform its predetermined and excessive course of services, NextGen purported to make nearly identical examination findings relative to the patients at issue herein.

109.   Indeed, podiatrist Kallou testified that patients he encountered at NextGen were coached to report their injuries in the same manner:

> every single patient coming in was pretty much the same story, and
> pretty much pointing at the same thing – everyone kind of seemed

trained.  That was the, my biggest thing that started to develop as I, as I saw patients there.

110.   Many patients at issue herein were prescribed NextGen's extensive predetermined protocol of treatment without any physical examination being performed at all.

111.   NextGen's purported evaluations almost always resulted in nearly identical "diagnoses" which were merely recitations of patients' alleged subjective complaints, such as "pain" in various extremities and joints.

112.   Despite failing to actually perform thorough examinations and issuing diagnoses that were generic and meaningless, NextGen almost invariably prescribed the exact same extensive treatment, including:

- Medications, often including narcotics;
- Physical therapy three (3) times per week for four (4) weeks;
- Total disability from work for four (4) weeks;
- Replacement household services for four (4) weeks;
- Attendant care for four (4) weeks;
- DME;
- MRIs; and
- Urine drug testing.

113.   The predetermined and non-patient-specific nature of the courses of treatment ordered by NextGen are illustrated by the significant differences in age, injury history, and comorbidities of patients who were purportedly evaluated:

- Patient D.T. (Claim No. 942135536002) was just thirteen (13) years old on the date of her purported initial evaluation, but was nevertheless ordered disabled from both work and driving.  Household replacement

services, a course of physical therapy, and medications were also prescribed for D.T.

- Patient B.M. (Claim No. 035741302) was a 60-year-old diabetic on the date of her purported initial evaluation, and complained of pain only in her low back at the relatively minor intensity of 6 of 10 on the pain scale. B.M. was nevertheless prescribed a narcotic drug, three (3) MRIs, a PEMF device, and household services, in addition to being disabled from work and driving.

- Patient H.H. (Claim No. 928264525039) was twenty-five (25) years old on the date of his purported initial evaluation at NextGen, and was more than four (4) years removed from his alleged motor vehicle accident. During the intervening time period, H.H. had attempted numerous courses of treatment with other providers, none of which were addressed by NextGen. Instead, NextGen ordered a nearly identical course of therapy as prescribed to other patients at issue herein, including physical therapy, narcotic medications, and replacement services, and was ordered disabled from work and driving.

114. Every patient who presented for pain management treatment at NextGen was repeatedly directed to return to the clinic for purported follow-up evaluations.

115. Such follow-up examinations, if performed at all, nearly always found that patients' pain complaints remained the same, or in some cases increased, despite the extensive treatment ordered and performed by NextGen physicians.

116. Despite the failure of NextGen's purported treatment and orders to improve the condition of its patients, the same predetermined courses of treatment were routinely re-ordered without any medical justification.

117.   As detailed below, the use of such predetermined treatment plans that were not based on any valid examinations or diagnoses were used by NextGen to grossly overutilize physical therapy, medications, urine drug testing, DME, MRIs, and surgical procedures in disregard for applicable standards of care.

## B.    MEDICALLY UNNECESSARY DISABILITY CERTIFICATES

118.   Nearly   universally,   NextGen   wrote   disability   certificates   for unnecessary transportation services, attendant care, work disability, and replacement services, typically on a monthly basis, without regard to patients' individual and actual medical needs.

119.   By doing so, NextGen sought to bolster the (false) appearance of a more serious injury, and also to ensure patients returned for further visits with the defendants.

120.   As the disability certificates and replacement services prescriptions were written at one-month intervals, the patients were required to return to NextGen regularly for new forms, which were falsely billed to Liberty Mutual as patient examinations.

121.   Considering the diversity of gender, race, age, medical necessity, and injuries sustained in the defendants' patient population, it is highly improbable that the vast majority of patients at issue in this Complaint were actually disabled.

122. As an example of the defendants' indiscriminate disability certifications and prescriptions, notwithstanding the fact that Patient D.T. (Claim No. 942135536002) was only thirteen (13) years old at the time of her alleged motor vehicle accident, NextGen issued a disability certificate restricting her ability to drive a car even though legally she was not able to drive a car in the first place.

123. In fact, the vast majority of patients at issue in this Complaint had no objective documented deficits that could substantiate ongoing disability.

124. The disability certificates lasted for the duration of the patients' treatment by the defendants – beginning with the initial examination and continuing with the defendants' *pro forma* monthly renewal.

125. The defendants' nearly universal provision of disability certificates was not rooted in reasonable medical care, but served instead to ensure the patients would appear at NextGen for which the defendants billed Liberty Mutual.

### C. MEDICALLY UNNECESSARY DME

126. Another integral part of the defendants' predetermined treatment protocol was to prescribe excessive and unnecessary items of DME.

127. NextGen prescribed and issued the same types of DME for each patient regardless of the patients' individual medical needs.

128.   Most patients of NextGen were prescribed one or more of a TENS unit, back braces, extremity braces, cold therapy devices, and PEMF devices during their treatment.

129.   Much of the DME billed for by the defendants, including back braces, was counter-productive to treatment of the type of myofascial pain complaints reported by the majority of patients at issue herein.

130.   DME was ordered and issued not based on medical necessity, but rather based on the amount of billing they would generate to Liberty Mutual.

131.   Even when NextGen did not directly submit charges to Liberty Mutual for DME it ordered, the prescriptions were motivated by financial gain.

132.   For example, the manufacturer of the cold compression devices routinely ordered by NextGen, Baydoun, and Kutob unlawfully pays kickbacks to prescribers of thirty percent (30%) of the amount it collects from insurers.

133.   DME that was prescribed and issued for the defendants' financial gain and not based on an individualized evaluation of medical necessity is fraudulent and non-compensable under Michigan's No-Fault Act.

134.   NextGen physicians began prescribing PEMF devices only after Baydoun, a layperson, entered into an agreement with the PEMF device manufacturer to obtain a "trial" of devices to "see how the product was received in the personal injury marketplace."

135.   From May 31, 2017 to September 29, 2017, Baydoun obtained 83 PEMF devices and corresponding replacement parts.

136.   Not coincidentally, NextGen began billing Liberty Mutual for purportedly issuing PEMF devices on June 24, 2017.

137.   The PEMF manufacturer never had any communications with medical professionals at NextGen, and NextGen physicians did not understand how the devices were intended to work.

138.   No regulatory agency has approved the PEMF devices issued by NextGen as braces, and the president of the PEMF device manufacturer testified that the devices have "no bracing properties, but it's often confused as a brace because it looks like a brace."

139.   Nevertheless, NextGen (by and through Baydoun and Kutob) routinely referred to the PEMF devices as braces, directed patients to use them as though they were braces, and never explained why patients actually required pulsed electromagnetic field therapy.

140.   NextGen physicians also prescribed and issued PEMF devices to patients for whom they were expressly contraindicated and provided directions that were at odds with those supplied by the manufacturer.

141.   The Food and Drug Administration has determined that the PEMF devices allegedly issued by NextGen are not appropriate for patients under eighteen (18) years of age.

142.   NextGen nevertheless billed Liberty Mutual for two (2) separate PEMF devices that were allegedly issued to patient D.T. (Claim No. 942135536002), who was just fourteen (14) years old, without any evaluation of the potential danger posed thereby.

143.   The PEMF devices allegedly issued by NextGen are designed to provide the electromagnetic field for exactly two (2) hours.

144.   NextGen physicians, having no comprehension of how the devices obtained by layperson Baydoun actually worked, frequently advised patients to use the devices for up to three (3) hours per day.

145.   NextGen also failed to provide patients with the proper replacement supplies to actually use the PEMF devices issued.

146.   In order to use the PEMF devices allegedly issued by NextGen, patients were required to insert disposable pods into the devices with each use.

147.   The president of the PEMF device manufacturer testified that the shipments ordered by Baydoun included a number of pods for each device that were intended to be sufficient for a full course of treatment with the device.

148.   After Baydoun and NextGen failed to remit payment to the PEMF device manufacturer, all PEMF devices and pods in NextGen's possession that were not issued to patients were retrieved from NextGen by the manufacturer.

149.   Just sixteen (16) of 83 (19.2%) of the PEMF devices ordered by Baydoun were retrieved, but 424 of 711 (59.6%) boxes of pods were retrieved.

150.   In other words, NextGen gave patients less than half of the pods that would be necessary for the PEMF devices to be used as intended by the manufacturer.

151.   The failure of NextGen to properly prescribe and issue the PEMF devices illustrates that DME was used only to increase the charges submitted to insurers and not to address the actual medical needs of patients at issue herein.

### D.   MEDICALLY UNNECESSARY URINE DRUG TESTING

152.   NextGen routinely ordered and billed Liberty Mutual for alleged performance of urine drug testing that was medically unnecessary, unreasonable, excessive, and not performed in accordance with established standards of care.

153.   Urine drug testing is properly used in the context of pain management treatment when it is random and designed to ascertain whether patients are abusing or diverting potentially dangerous medications.

154.   Rather than using urine drug testing for medically necessary purposes, NextGen billed Liberty Mutual for urine drug tests allegedly performed for nearly every patient, at nearly every purported examination.  *See* Exhibit 1.

155.   The urine drug tests billed by NextGen were for purported presumptive/qualitative screening performed on urine specimens at NextGen's clinic.

156.   Until February 2018, NextGen billed Liberty Mutual for such tests using CPT Code 80306, which represents that tests were performed using a dipstick and interpreted with instrumented assistance.

157.   Beginning in February 2018, NextGen billed Liberty Mutual for tests using CPT Code 80305, which represents that tests were performed using a dipstick and interpreted using direct optical observation.

158.   Regardless of the method of interpretation, the urine drug tests billed by NextGen cost less than $10 to perform.

159.   NextGen invariably billed Liberty Mutual $1,404 (for CPT Code 80306) or $400 (for CPT Code 80305).  Id.

160.   The urine drug tests billed by NextGen were not medically necessary because they were performed indiscriminately at every appointment, they were performed on specimens provided by patients who were not prescribed medications susceptible to abuse or misuse, and the results were not used to guide patient care.

27

161. For example, NextGen billed Liberty Mutual for purportedly examining patient P.B. (Claim No. 356219950004) on fourteen (14) separate dates from August 17, 2017 to December 11, 2018, and on all but one (1) date also submitted a charge for the alleged performance of a urine drug screen.

162. Performing a urine drug test at every patient appointment negates the utility of the test as the patient is afforded the opportunity to prepare for and potentially adulterate his or her urine specimen.

163. NextGen also billed Liberty Mutual for allegedly performing a urine drug test on a specimen provided by patient D.T. (Claim No. 942135536002), who was thirteen (13) years old at the time and was not prescribed any narcotics or other potentially dangerous medications.

164. Most egregiously, NextGen did not take any action when the urine drug tests it ordered and performed revealed that its patients were abusing or misusing the dangerous narcotic drugs it regularly prescribed.

165. For example, patient A.T. (Claim No. 036026853) had a documented history of attempted suicide, including a drug overdose on July 17, 2017.

166. NextGen billed Liberty Mutual for alleged performance of urine drug screens at every evaluation of A.T., but never recorded the results.

167. On December 17, 2017, NextGen referred a urine specimen provided by A.T. for definitive/comprehensive testing at an outside laboratory.

168.   A.T.'s December 17, 2017 urine specimen tested positive for numerous dangerous drugs of abuse, including cocaine, fentanyl, Demerol, PCP, Xanax, ketamine, and oxazepam.

169.   Despite A.T.'s history of drug abuse and self-harm, and the extensive evidence of abuse of numerous substances provided by this urine drug test, NextGen never altered A.T.'s care, referred her for counseling, or even documented the evidence of drug abuse in its own patient chart.

170.   Instead, NextGen continued prescribing A.T. opiates in the face of this evidence of abuse, in a shocking violation of the standard of care for narcotic drug prescriptions.

171.   Similarly, patient N.T. (Claim No. 942135536002) had a documented history of drug abuse, including using Xanax that was prescribed to her mother and testing positive for numerous unprescribed substances.

172.   NextGen made no reference to N.T.'s history of drug abuse, and instead prescribed her with the dangerous combination of Xanax (a benzodiazepine) and oxycodone 30mg (a dangerous and powerful narcotic).

173.   On March 13, 2017, NextGen ordered a urine drug test that was negative for all prescribed medications, including the Xanax and oxycodone.

174.   On May 24, 2017, NextGen ordered a urine drug test that was positive for illicit substances.

175.   These inconsistent results that evidenced drug abuse and misuse of the dangerous prescribed medications was never addressed by NextGen, and N.T.'s pharmacologic treatment continued unchanged.

176.   The lack of medical necessity of urine drug testing ordered and performed by NextGen is also evidenced by its referral of nearly every urine specimen to laboratories owned and operated by its associates for additional definitive/comprehensive testing.

177.   Definitive/comprehensive testing is only proper when presumptive/qualitative testing produces unexpected results.

178.   The vast majority of the presumptive/qualitative urine drug tests allegedly performed by NextGen produced results consistent with the reported prescribed medications.

179.   Even when presumptive/qualitative testing produces unexpected results, it is not proper to immediately refer the specimen for more extensive testing.

180.   Instead, the physician should discuss the unexpected results with the patient, and if the patient admits to drug misuse, further confirmatory testing is unnecessary.

181.   NextGen never discussed unexpected test results with patients as both the urine screens it performed and confirmatory tests it ordered were only intended to generate bills to Liberty Mutual.

182.   As discussed above, NextGen did not alter patient treatment even when presented with evidence of drug abuse or diversion, so referral of specimens with abnormal results were also unnecessary as further confirmation of unexpected results was not used to guide patient care.

### E.   MEDICALLY UNNECESSARY PROCEDURES

183.   NextGen, Baydoun, and Kutob subjected patients at issue herein to medically unnecessary invasive procedures and surgeries for which they submitted outrageous and improperly billed charges, discussed *infra*.

184.   The performance of invasive procedures and surgeries must be based on adequate diagnoses and legitimate medical necessity.

185.   As detailed above, NextGen did not perform physical examinations sufficient to make any diagnoses that justify the performance of invasive procedures.

186.   The injections billed by NextGen had no relation to patients' actual medical needs.

187.   For example, NextGen rarely, if ever, performed trigger point injections despite routinely documenting trigger points and myofascial tenderness in its own records.

188.   Instead, NextGen billed Liberty Mutual for injections that allowed it to seek higher reimbursement, both for the injection itself and for unnecessary ancillary charges, such as use of anesthesia and a surgical facility.

31

189.   NextGen routinely subjected its patients to epidural steroid injections despite patient reports of only axial back pain without radicular symptoms, which far exceeds the standard of care for treating such complaints.

190.   In order to multiply the charges submitted to Liberty Mutual by NextGen and its associates, the defendants also routinely subjected patients to anesthesia during injections, a risky practice that the American Society of Anesthesiologists has warned against as it is a major factor in the occurrence of inadvertent neural injury.

191.   NextGen also subjected patients to repeated injection procedures without evaluating the efficacy of previously-performed treatments.

192.   For example, NextGen billed Liberty Mutual for a sacroiliac ("SI") joint injection to patient B.M. (Claim No. 035741302) on April 10, 2018, despite no prior documentation of SI joint tenderness or positive SI joint maneuvers.

193.   Without evaluating the efficacy of this first injection, NextGen billed Liberty Mutual for a second SI joint injection just two (2) weeks later, on April 24, 2018.

194.   NextGen further endangered its patients by subjecting them to potent steroid injections in far greater numbers than are considered safe.

195.   NextGen also pressured patients to undergo surgical procedures that were not indicated and without first attempting conservative care.

196.   For example, patient N.T. (Claim No. 942135536002) was evaluated by NextGen surgeon Michael Donahue, M.D. on June 16, 2017, who documented non-specific pain complaints with non-anatomic motor findings and no dermatomal description of his alleged sensory examination.

197.   Moreover, N.T. had reported significant improvement following a cervical injection just weeks prior, which was not considered at this purported evaluation.

198.   Despite this clearly inadequate purported examination, NextGen scheduled N.T. for a cervical fusion surgery that was performed on June 30, 2017.

199.   The unsupported cervical fusion surgery was one of five (5) surgeries performed by NextGen on N.T. over just seven (7) months, all despite the patient exhibiting symptoms of myalgia that should have been treated conservatively and without surgery.

## X.   FRAUDULENT BILLING PRACTICES

200.   The Michigan No-Fault Act requires providers to submit charges for services at rates that are reasonable and customary.

201.   NextGen, Baydoun, and Kutob routinely billed Liberty Mutual at rates that were unreasonable and had no relation to the services allegedly performed.

202.   Every charge submitted by NextGen at issue herein was billed at a rate that was several times higher than the reasonable and customary amount for the services provided.

203.   In order to assure that it received some payment for its fraudulent bills, NextGen, Baydoun, and Kutob entered into contracts to sell NextGen's accounts receivable to third parties for a fraction of the amount billed to Liberty Mutual.

204.   Specifically, NextGen (by and through Baydoun and Kutob) routinely entered into contracts to sell its accounts receivable to an entity called HMRF-Fund III, LLC for just 26% percent of the amount it billed to Liberty Mutual.  *See* Exhibit 6.

205.   In other words, NextGen set the amounts it charged to Liberty Mutual to an amount for which it only actually expected to receive 26% of the total billed.

206.   In order to maximize the amount received, NextGen inflated its charges to outrageous amounts.

207.   For example, and as discussed above, NextGen routinely submitted charges totaling $17,750 for PEMF devices that were unlawfully issued to patients, if they were issued at all.

208.   The president of the company from which NextGen obtained the PEMF devices was shown a charge billed by NextGen relative to patient D.T. (Claim No. 942135536002) and testified that the exorbitant amount "makes me sick and angry."

209.   As discussed above, NextGen routinely billed Liberty Mutual $1,404 for alleged urine drug screens performed using a dipstick that cost it less than $10.

210.   Liberty Mutual is not obligated to pay pending bills submitted using unreasonable and uncustomary charge amounts and it is entitled to reimbursement for bills for which it has already tendered payment.

## XI.   MISREPRESENTATIONS MADE TO AND RELIED ON BY LIBERTY MUTUAL

211.   To induce Liberty Mutual to pay promptly their fraudulent charges, the defendants submitted to Liberty Mutual false documentation that materially misrepresented that the services they referred and billed were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

212.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

213.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157.

214.   Thus, every time the defendants submitted bills and medical records to Liberty Mutual supporting their claims for No-Fault benefits, the defendants

necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

215.   There are no less than eleven (11) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Liberty Mutual.

    a.    NextGen, Baydoun, and Kutob billed Liberty Mutual for treatment and services that were not actually provided.  Patients at issue in this Complaint have denied receiving treatments and services for the lengths of time required, in the manner required, or in some cases, reported not receiving treatment and services at all from these defendants.

    b.    NextGen, Baydoun, and Kutob, and their associates, made cash payments and used kickbacks to induce patients to undergo and physicians to order medically unnecessary treatment, including payments by Baydoun and Kutob to NextGen physicians to incentivize them to order and bill for medically unnecessary services.

    c.    The defendants billed Liberty Mutual for unlawfully performed treatment.  NextGen lacked required licensure to issue DME in Michigan and billed for spinal evaluation and treatment performed by a podiatrist.

    d.    The defendants forged, falsified, and altered records to induce payment from Liberty Mutual.  NextGen failed to have physicians sign their records, thus leaving them unlocked for layperson Baydoun to alter.

    e.    The defendants obtained patients through unlawful solicitation. NextGen, Baydoun, and Kutob engaged in *quid pro quo* relationships with other providers to establish a network of incessant and unjustified referrals.  The defendants' methods of obtaining patients and making referrals did not include considerations of medical necessity.

    f.    The defendants used an unlawful predetermined treatment protocol, implemented by NextGen's ordering of excessive physical therapy,

disability certificates, DME, diagnostic testing, medication, injection therapy, surgery, and urine drug testing. This predetermined protocol is confirmed by the nearly identical purported findings and treatment plans ordered for patients at issue in this Complaint, which have no relationship to medical necessity or any patient-specific considerations.

g.      NextGen, Baydoun, and Kutob billed Liberty Mutual for medically unnecessary and contraindicated DME that it issued to patients, if at all, in furtherance of the defendants' predetermined treatment protocol to bill Liberty Mutual for as many ancillary services as possible and not based on individual patient need.

h.      NextGen, Baydoun, and Kutob prescribed excessive physical therapy for patients and directed these patients to physical therapy clinics with which they associated and relied upon for patient referrals, without any individual determination of medical necessity, and without any evaluation of the efficacy of such treatment. The predetermined nature of these referrals is illustrated by orders for physical therapy without reference to whether or not the patient was already attending physical therapy or whether it was effective.

i.      NextGen, Baydoun, and Kutob ordered and billed for medical unnecessary urine drug testing, as evidenced by the lack of influence of urine drug test results on their prescription habits, which continued without change even in the face of evidence that patients were abusing or diverting the drugs prescribed.

j.      NextGen, Baydoun, and Kutob subjected patients to dangerous invasive treatments and surgeries that were medically unnecessary and selected only because they allowed for the most aggressive charges to submit to Liberty Mutual.

k.      The defendants charged Liberty Mutual grossly unreasonable and uncustomary amounts for all of the treatment and services allegedly performed.

216. As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and rendered treatment without basis or adequate substantiation.

217. The foregoing facts – billing for services not rendered, unlawfully soliciting patients, offering inducements, falsifying documents, using a predetermined treatment protocol to inflate charges, and misrepresenting the necessity of procedures billed – were not, and could not have been, known to Liberty Mutual until it commenced its investigation of the defendants shortly before the filing of this action.

218. Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment, services, and testing billed by the defendants unnecessary and unlawful.

219. The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific representative patients set out above and in the chart annexed at Exhibit 1.

220. Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act mailed to Liberty Mutual by the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

221.   Moreover, each Health Insurance Claim Form ("HICF") bill submitted to Liberty Mutual by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

222.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Liberty Mutual via the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, testing, procedures, and ancillary services for which they billed Liberty Mutual.

223.   As the defendants did not render lawful and reasonably necessary medical treatment, services, and testing, and misrepresented the treatment, services, and testing purportedly performed, each bill and accompanying documentation mailed by or on behalf of the defendants to Liberty Mutual in order to seek reimbursement under Michigan's No-Fault Act constitutes a material misrepresentation.

224. Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Liberty Mutual did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

225.    The facially valid documents submitted to Liberty Mutual by the defendants were designed to, and did in fact, induce Liberty Mutual to rely on the documents.

226.    In reliance on the defendants' misrepresentations, Liberty Mutual paid money to the defendants to its detriment.

227.    Liberty Mutual would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and services billed.

228.    As a result, Liberty Mutual has paid in excess of $24,873 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for reimbursement under the Michigan No-Fault Act.

## XII.   THE DEFENDANTS' MAIL FRAUD RACKETEERING ACTIVITY

229.    As discussed *supra*, the referrals, treatment, and services purportedly provided by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

230.    The objective of the scheme to defraud Liberty Mutual, which occurred throughout the period noted in Exhibit 1, was to collect insurance payments under Liberty Mutual policies and applicable provisions of the Michigan No-Fault Act to

which the defendants were not entitled because the medical services rendered, if at all, were not necessary, were not lawfully rendered, and were fraudulently billed.

231.  This objective necessarily required the submission of claims for reimbursement to Liberty Mutual.

232.  The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service.

233.  All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

234.  Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, benefits payment checks, and the return of the cancelled check drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of check draft duplicates to Liberty Mutual for filing.

235.  Every payment at issue in this Complaint where Liberty Mutual was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Liberty Mutual using the U.S. Mail.

236.   The fraudulent medical billing scheme detailed herein generated hundreds of mailings.

237.   A chart highlighting representative examples of mail fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 7.

238.   As detailed herein, the defendants also submitted medical documentation and claims for payment to Liberty Mutual via the U.S. Mail related to each representative patient discussed in this Complaint.

239.   It was within the ordinary course of business for NextGen to submit bills for No-Fault reimbursement to insurance carriers like Liberty Mutual through the U.S. Mail.

240.   NextGen, at the direction and with the knowledge of its owners and managers (i.e., Baydoun and Kutob), continues to submit claims for payment to Liberty Mutual and, in some instances, continues to commence litigation against Liberty Mutual seeking to collect on unpaid claims.

241.   Thus, the defendants' commission of mail fraud continues.

242.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Liberty Mutual by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

243.   Liberty Mutual reasonably relied on the submissions it received from NextGen including the representative submissions set out in Exhibit 7 annexed hereto and identified in the representative patient claims above.

244.   As the defendants agreed to pursue the same criminal objective (namely, mail fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Liberty Mutual's damages.

## XIII. DAMAGES

245.   The pattern of fraudulent conduct by the defendants injured Liberty Mutual in its business and property by reason of the aforesaid violations of law.

246.   Although it is not necessary for Liberty Mutual to calculate damages with specificity at this stage in the litigation, and Liberty Mutual's damages continue to accrue, Liberty Mutual's injury includes, but is not limited to, compensatory damages in excess of $24,873.

247.   Exhibit 8 annexed hereto and incorporated herein as if fully set forth in its entirety, identifies monies paid by Liberty Mutual to the defendants by date, payor, patient claim number, check number, and amount.

248.   Every claim identified in Exhibit 8 derives from a Liberty Mutual insurance policy.

249.   Every payment identified in Exhibit 8 was made by Liberty Mutual alone and from checks sent to the defendants through the U.S. Mail, and Liberty Mutual has not been reimbursed for any of the payments itemized in Exhibit 8.

250.   Liberty Mutual also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

251.   Liberty Mutual investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIV.  <u>CAUSES OF ACTION</u>

<u>COUNT I</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(NextGen Enterprise)**
**Against Abdul Baydoun and Nura Kutob**

252.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 251 set forth above as if fully set forth herein.

253.   NextGen constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

254.   In connection with each of the claims identified in the within Complaint, Baydoun and Kutob ("Count I defendants") intentionally caused to be prepared and mailed false medical documentation by NextGen, or knew that such

false medical documentation would be mailed in the ordinary course of NextGen's business, or should have reasonably foreseen that the mailing of such false medical documentation by NextGen would occur, in furtherance of the Count XIII defendants' scheme to defraud.

255.   The Count I defendants knew that two (2) or more mailings would be sent through the U.S. Mail to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 7.

256.   As documented above, the Count I defendants repeatedly and intentionally submitted documentation to Liberty Mutual through the U.S. Mail for medical services that were purportedly performed by NextGen, which they knew would be billed by NextGen, in order to collect payment from Liberty Mutual under Liberty Mutual policies and applicable provisions of the Michigan No-Fault Act.

257.   Baydoun and Kutob owned and managed NextGen and were responsible for all actions taken by NextGen and its staff.

258.   The Count I defendants submitted false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted NextGen to continue providing unlawful and medically unnecessary treatment, if provided at all.

259.   As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued

payment drafts to NextGen for the benefit of the Count I defendants that would not otherwise have been paid.

260.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

261.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted by them together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (NextGen Enterprise)
### Against Abdul Baydoun and Nura Kutob

262.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 251 set forth above as if fully set forth herein.

263.   Defendants Baydoun and Kutob ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of NextGen.

264.   The Count II defendants each agreed to further, facilitate, support, and operate the NextGen enterprise.

265.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

266.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of NextGen even though NextGen was not eligible to collect such payments by virtue of its unlawful conduct.

267.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

268.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

269.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## COMMON LAW FRAUD
### Against All Defendants

270.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 251 set forth above as if fully set forth herein.

271.   The scheme to defraud perpetrated by NextGen, Baydoun, and Kutob ("Count III defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to Liberty Mutual policies and applicable provisions of the Michigan No-Fault Act.

272.   The misrepresentations of fact made by the Count III defendants include, but are not limited to, those material misrepresentations discussed in section XI *supra*.

273.   The Count III defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

274.   The misrepresentations were intentionally made by the Count III defendants in furtherance of their scheme to defraud Liberty Mutual by submitting non-compensable claims for payment pursuant to Liberty Mutual policies and applicable provisions of the Michigan No-Fault Act would be submitted to Liberty Mutual.

275.   The Count III defendants' misrepresentations were known to be false and were made for the purpose of inducing Liberty Mutual to make payments for claims that are not compensable under Liberty Mutual policies and Michigan law.

276.   Liberty Mutual reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

277.   As a direct and proximate result of the defendants' fraudulent representations and acts, Liberty Mutual has been damaged in its business and property as previously described herein.

<u>COUNT IV</u>
**CIVIL CONSPIRACY**
**Against All Defendants**

278.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 251 set forth above as if fully set forth herein.

279.   Defendants NextGen, Baydoun, and Kutob ("Count IV defendants") combined and concerted to accomplish the unlawful purpose of defrauding Liberty Mutual by submitting claims for reimbursement pursuant to Liberty Mutual policies and applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary

medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

280.   The Count IV defendants worked together to achieve an unlawful purpose (namely, defrauding Liberty Mutual for personal gain).

281.   This purpose was known to all of the Count IV defendants and intentionally pursued.

282.   Despite knowing that the defendants were not entitled to reimbursement pursuant to Liberty Mutual policies and applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count IV defendants nonetheless submitted claims (with accompanying false medical documentation) to Liberty Mutual seeking payment.

283.   In reasonable reliance on the false medical documentation submitted by the defendants, Liberty Mutual paid certain of the claims submitted.

284.   All of the Count IV defendants directly benefited from the payments made to NextGen.

285.   All of the Count IV defendants actively and intentionally partook in a scheme to defraud Liberty Mutual and also encouraged and aided other Count IV

defendants in the commission of acts done for the benefit of all Count IV defendants and to the unjustified detriment of Liberty Mutual.

286.   Accordingly, all of the Count IV defendants are equally liable for the fraud perpetrated on Liberty Mutual pursuant to their conspiracy.

### COUNT V
### PAYMENT UNDER MISTAKE OF FACT
### Against NextGen Pain Associates and Rehabilitation LLC

287.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 251 set forth above as if fully set forth herein.

288.   Liberty Mutual paid the amounts described herein and itemized in Exhibit 8 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Liberty Mutual by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by NextGen.

289.   Liberty Mutual sustained damages by paying under a mistake of fact the claims submitted by NextGen, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

290.   NextGen would be unjustly enriched if permitted to retain the payments made to it by Liberty Mutual under a mistake of fact.

291.    Liberty Mutual is entitled to restitution from NextGen for all monies paid to and/or received by them from Liberty Mutual.

**COUNT VI**
**UNJUST ENRICHMENT**
**Against NextGen Pain Associates and Rehabilitation LLC**

292.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 251 set forth above as if fully set forth herein.

293.    Liberty Mutual paid monies, including those amounts set out in Exhibit 8 in response to the claims submitted by defendant NextGen in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

294.    Liberty Mutual's payments constitute a benefit which NextGen aggressively sought and voluntarily accepted.

295.    NextGen wrongfully obtained payments from Liberty Mutual through the fraudulent scheme detailed herein.

296.    NextGen has been unjustly enriched by receipt of these wrongfully obtained payments from Liberty Mutual.

297.    NextGen's retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT VII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

298.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 251 set forth above as if fully set forth herein.

299.   Defendants NextGen, Baydoun, and Kutob ("Count VII defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

300.   The Count VII defendants also rendered services pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for the purpose of generating claims to Liberty Mutual, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

301.   Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.   Mich. Comp. Laws §§ 500.3105 and 500.3107.

302.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.   Mich. Comp. Laws § 500.3107.

303.   The lack of lawfully-rendered treatment (such as treatment arising from illegal solicitation and unlicensed treatment) is also a defense to an insurer's obligation to pay No-Fault benefits.

304.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

305.   The Count VII defendants continue to submit claims under Liberty Mutual policies and applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Liberty Mutual, and other claims remain pending with Liberty Mutual.

306.   The Count VII defendants will continue to submit claims under Liberty Mutual policies and applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Liberty Mutual has no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count VII defendants for any or all of the reasons set out in the within Complaint.

307.   Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VII defendants billed for unnecessary and unlawful treatment that is not compensable

under Liberty Mutual policies and applicable provisions of the Michigan No-Fault Act.

308.   Liberty Mutual also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VII defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Liberty Mutual at all relevant times.

309.   As such, the Count VII defendants have no standing to submit, pursue, or receive benefits or any other payment from Liberty Mutual, and Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VII defendants cannot seek payment from Liberty Mutual for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

310.   Liberty Mutual further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VII defendants cannot balance bill or otherwise seek payment from any person insured under an Liberty Mutual policy or for whom Liberty Mutual is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XV.  <u>DEMAND FOR RELIEF</u>

WHEREFORE, plaintiffs Liberty Mutual Fire Insurance Company, LM General Insurance Company, LM Insurance Corporation, and Safeco Insurance Company of Illinois respectfully pray that judgment enter in their favor as follows:

<u>COUNT I</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(NextGen Enterprise)**
**Against Abdul Baydoun and Nura Kutob**

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

<u>COUNT II</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(NextGen Enterprise)**
**Against Abdul Baydoun and Nura Kutob**

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT III**
**COMMON LAW FRAUD**
**Against All Defendants**

(a)     AWARD Liberty Mutual its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Liberty Mutual its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

**COUNT IV**
**CIVIL CONSPIRACY**
**Against All Defendants**

(a)     AWARD Liberty Mutual its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Liberty Mutual its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT V
### PAYMENT UNDER MISTAKE OF FACT
### Against NextGen Pain Associates and Rehabilitation LLC

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT VI
### UNJUST ENRICHMENT
### Against NextGen Pain Associates and Rehabilitation LLC

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT VII
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)     DECLARE that Liberty Mutual has no obligation to pay pending and previously-denied insurance claims submitted by NextGen Pain Associates and Rehabilitation LLC, Abdul Baydoun, and Nura Kutob, jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that NextGen Pain Associates and Rehabilitation LLC, Abdul Baydoun, and Nura Kutob, jointly and severally, cannot seek payment from Liberty Mutual pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of

any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)     DECLARE that NextGen Pain Associates and Rehabilitation LLC, Abdul Baydoun, and Nura Kutob, jointly and severally, cannot balance bill or otherwise seek payment from any person insured under a Liberty Mutual policy or for whom Liberty Mutual is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVI.     DEMAND FOR JURY TRIAL

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*
_____
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
Andrew H. DeNinno
adeninno@smithbrink.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2303
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs Liberty*
*Mutual Fire Insurance Company, LM*
*General Insurance Company, LM*
*Insurance Corporation, and Safeco*
*Insurance Company of Illinois*

Dated:  September 10, 2019